1                 UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF FLORIDA
                 WEST PALM BEACH DIVISION
3
                 CASE NO. 16-CR-60117-HURLEY
4

5       **UNITED STATES OF AMERICA,**      .

6       Plaintiff,                    .

7            vs.                       .
                                       .
8       **ANTHONY SWABY,**            .  West Palm Beach, FL
                                       .  October 13, 2016
9       Defendant.                    .

10
                       CHANGE OF PLEA PROCEEDINGS
11         BEFORE THE HONORABLE DANIEL T. K. HURLEY
                   UNITED STATES DISTRICT JUDGE
12

13      APPEARANCES:

14

        FOR THE PLAINTIFF:    **JODI ANTON**
15                            United States Attorney's Office
                              500 East Broward Boulevard
16                            Suite 700
                              Fort Lauderdale, FL 33394
17                            561-820-8711

18      FOR THE DEFENDANTS:   **ROBIN ROSEN-EVANS, ESQ.**
                              Federal Public Defender's Office
19                            450 Australian Avenue
                              Suite 500
20                            West Palm Beach, FL 33401
                              561-833-6288
21

        COURT REPORTER:       Pauline A. Stipes
22                            Official Federal Reporter
                              HON. ROBIN L. ROSENBERG
23                            Fort Pierce/West Palm Beach
                              772-467-2337
24

25

```
 1              THE COURT:  Anthony Swaby.  Ladies and gentlemen,
 2   first, do the parties need a few moments?  Is there anything
 3   that needs to be signed?
 4              This is 16-60117, United States of America versus Mr.
 5   Anthony Swaby.
 6              Let me begin, if I might, by allowing counsel to make
 7   appearances.  Counsel for the Government.
 8              MRS. ANTON:  Good afternoon, Jodi Anton on behalf of
 9   the United States.
10              THE COURT:  Counsel for the defense.
11              MS. ROSEN-EVANS:  Robin Rosen-Evans.
12              THE COURT:  Good afternoon and good afternoon, Mr.
13   Swaby.
14              THE DEFENDANT:  Good afternoon.
15              THE COURT:  It is my understanding there have been
16   discussions had on behalf of the Government and Mr. Swaby, and
17   Mr. Swaby desires to change his plea from not guilty to guilty.
18   Is that right?
19              MS. ROSEN-EVANS:  Yes, Your Honor.
20              THE COURT:  Could I ask you to come over to the
21   lectern, and I will ask our courtroom deputy to administer the
22   oath to Mr. Swaby.
23         (Thereupon, the defendant was duly sworn.)
24   BY THE COURT:
25   Q.  Mr. Swaby, would you introduce yourself for the record,
```

1  sir?

2  A.  Anthony Swaby.

3  Q.  I am sorry.  I have been mispronouncing your name.

4  A.  No problem.

5  Q.  Mr. Swaby, do you understand you have promised now to

6  answer all of the questions truthfully?

7      Do you understand that?

8  A.  Yes, Your Honor.

9  Q.  Do you understand that if by some chance you were purposely

10  untruthful, you could be putting yourself at risk to be charged

11  with another crime, the crime of perjury or giving a false

12  statement while under oath?

13      Do you understand that, too?

14  A.  Yes, Your Honor.

15  Q.  Let me suggest what you want to do is, first, relax, listen

16  carefully to the questions and go ahead and answer them as

17  accurately and completely as you can.

18      I hope you know that nobody wants you to plead guilty

19  unless, number one, you really did whatever the Government is

20  claiming; and second, and I think just as important, you should

21  not plead guilty unless you have come to the firm conclusion in

22  your own mind that it is in your best interest to resolve the

23  case this way.

24      If there is anything at all that I say that you don't

25  understand or if there is something you would like to talk

1  about in greater detail, I want you to feel free to stop me and

2  let me know and we can talk about that.

3      By the way, if in the course of our discussion you need to

4  talk to Ms. Rosen-Evans privately, let me know and I will give

5  that you opportunity as well.  Okay?

6  A.  Okay.

7  Q.  All right.  I would like to begin by asking you about your

8  representation by Ms. Rosen-Evans.

9      I know she is associated with the Federal Public Defender's

10  Office, so I am assuming the Court appointed her and asked her

11  to help you out in the case; is that right?

12  A.  Yes, Your Honor.

13  Q.  Have you met with her and discussed with her in detail all

14  of the charges the Government brought against you in this case?

15  A.  Yes, Your Honor.

16  Q.  When you had those discussions, did you talk about, if

17  there had to be a trial, what the Government's evidence might

18  be at that trial, and what you could do to defend yourself in

19  light of that evidence?

20      Did you talk about those things?

21  A.  Yes, Your Honor.

22  Q.  In other words, did she let you know whether there were

23  videos she may have seen or things like that, that sort of

24  thing?

25  A.  Yes.

1    *Q.* Okay.

2       Now, I have a document in front of me and it is called a

3    Plea Agreement and your name is typewritten on the first page,

4    and when we go to the last page again, your name is typewritten

5    and there is a signature above that.

6       Mr. Swaby, is that your signature?

7    *A.* Yes, Your Honor.

8    *Q.* Before you signed this document, did you go over every

9    single provision in this document with Ms. Rosen-Evans?

10   *A.* Yes, Your Honor.

11   *Q.* Okay.

12      May I ask you, are you satisfied with the advice and

13   services that Ms. Rosen-Evans has provided to you while she has

14   been acting as your lawyer in this case?

15   *A.* Yes.

16         *THE COURT:* May I ask the parties, is there a written

17   factual statement?

18         *MS. ROSEN-EVANS:* Not a signed one, no, Your Honor.

19   *BY THE COURT*:

20   *Q.* Okay.

21      Now, I wonder if I could ask you to tell us about yourself.

22   How old are you today?

23   *A.* 32.

24   *Q.* And today, are you a citizen of the United States?

25   *A.* Yes.

1    *Q.*   Where are you from?

2    *A.*   Newark, New Jersey.

3    *Q.*   Have you lived in Florida a long time?

4    *A.*   Off and on, 18 years.

5    *Q.*   Your mother and father and family members, are they up in

6    New Jersey or are they here?

7    *A.*   My mother in Florida, my dad in Jamaica.

8    *Q.*   Jamaica?

9    *A.*   Yes.

10   *Q.*   Tell me about your educational background.  How far did you

11   go in school?

12   *A.*   9th grade.

13   *Q.*   Where did you do that?

14   *A.*   Newark, New Jersey.  I also went to school in Florida,

15   middle school and elementary.

16   *Q.*   The last school year you finished was the 9th grade in New

17   Jersey?

18   *A.*   Yes.

19   *Q.*   Have you done any academic work after that, high school or

20   anything else?

21   *A.*   High school in New Jersey, and a couple of classes due to

22   incarceration.

23   *Q.*   While in jail, you have been able to take some classes?

24   *A.*   GED, I couldn't complete the program.

25   *Q.*   Okay, okay.  You probably do want to complete that if you

```
 1   can.  It opens certain doors.  I leave that up to you.
 2        Are you married today?
 3   A.   No.
 4   Q.   Do you have children?
 5   A.   Yes, I do.
 6   Q.   Can I ask you the number of children and ages?
 7   A.   Four.
 8   Q.   Just the age range?
 9   A.   14, 12, 8 and 5.
10   Q.   Now, are they here in Florida or New Jersey?
11   A.   Two in Florida, and two in Trinidad.
12   Q.   Trinidad?
13   A.   Yes.
14   Q.   Okay.
15        I need to ask you a couple of other personal questions, and
16   I want to ask you this only so I can make an evaluation of your
17   ability to make the judgment you are thinking about making.
18        The first question would be whether you have ever gone to
19   see somebody we describe as a mental health professional,
20   psychiatrist, psychologist, anybody like that, because of
21   mental or emotional problems.  Have you ever done that?
22   A.   Yes.
23   Q.   Can you tell me about it?
24   A.   He did a mental evaluation due to my drug history, and that
25   was about it.
```

1  Q.  When was that, approximately?

2  A.  2008, 2009.

3  Q.  Did anyone suggest to you that you were suffering from any

4  mental illness or psychological problem?

5  A.  The mother of my kids.

6  Q.  She did.  She thought there was a problem?

7  A.  Yes.

8  Q.  The person you went to see, was it a psychologist or

9  psychiatrist?

10  A.  He was a psychologist.

11  Q.  What did he conclude, if you know?

12  A.  He said I could get better if I stick to the program.

13  Q.  Was he trying to deal with drug addiction?

14  A.  Yes.

15  Q.  Okay, all right.  But no mental illness?

16  A.  Not that he concluded, no.

17  Q.  Do you feel you are suffering from any mental illness?

18  A.  No.

19  Q.  Okay.  All right.

20      I meant to ask you about this before, but tell me about the

21  work you have done as an adult.  What field have you worked in?

22  A.  Construction, carpentry, roofing, fast food.

23  Q.  What else were you doing before you were arrested in this

24  case?

25  A.  I had a tiling job.

```
1   Q.  How long did you hold that job?

2   A.  Three weeks.

3   Q.  Short.

4   A.  Yes.

5   Q.  How about before that?

6   A.  I had a couple of moving jobs, that was about it.

7   Q.  Sporadic employment?

8   A.  Yes.

9   Q.  You have kind of alluded to this, and I want to come back

10  to it.  Have you been using illegal drugs?

11  A.  Yes.

12  Q.  Tell me about that; what have you been using?

13  A.  Crack cocaine, marijuana, coke, Flakka.

14  Q.  Flakka?

15  A.  Yes.

16  Q.  Okay.

17      If you had to look back now and say the last time you had

18  any illegal drug, how far back are we talking about?

19  A.  My incarceration.  That was April 16th.

20  Q.  2016?

21  A.  Yes, 2016.

22  Q.  Let me tell you why I am asking you this.  It is so

23  important today here in the courtroom you be clear headed so

24  you can listen to everything that is said, so you can evaluate

25  this information and make the judgments you think are the right
```

1   judgments for yourself.

2         Do you feel you can do that?

3   A.   Yes.

4   Q.   I think the one that sticks out in everybody's mind is

5   heroin.

6         When you stop using heroin, the body craves it, you could

7   go through serious withdrawal.  Are you experiencing anything

8   like that from any of these drugs?

9   A.   No.

10  Q.   Can I ask you about your physical health today; how would

11  you describe your physical health today?

12  A.   Healthy.

13  Q.   Do you take any prescription medicine on a regular basis?

14  A.   No.

15  Q.   I know we are here to talk about entering a plea of guilty,

16  but before we go too far in this direction, I want to review

17  certain rights guaranteed to you by the Constitution.

18        You may know what I am about to say, but I want to make

19  sure you are aware of these rights.

20        I need to make sure you have thought about that fact so if

21  you do decide to plead guilty, one of the things you are doing

22  is taking these rights and giving them up.

23        The most important right guaranteed to you by the

24  Constitution is the right to have a jury trial.

25        I want to make sure you understand there is no obligation

1    that you come to court today and plead guilty.  Under the

2    Constitution, you have the right to say my plea is going to be

3    not guilty, I want to have a trial, and I want to have 12

4    people from the community to come in and sit as a jury.  The

5    jury listens to all the information, all the evidence, and it

6    would be the jury that would decide the result of that trial,

7    that would decide the verdict.

8        So, do you understand you have the right to plead not

9    guilty and have a trial by jury?

10   A.  Yes, Your Honor.

11   Q.  Do you understand that if we did have a trial,

12   Ms. Rosen-Evans, as your lawyer, would be here from the

13   beginning to the end to help you out?

14       Do you understand that as well?

15   A.  Yes.

16   Q.  I want to make sure you understand how a trial works.

17       We say the responsibility to bring the evidence, bring the

18   proof into the courtroom, we put that a hundred percent on the

19   prosecutor's shoulders.

20       The person accused of violating the law, they wouldn't have

21   to prove anything.  You won't have to disprove anything, you

22   won't have to speak at the trial.

23       Do you understand that?

24   A.  Yes, I do.

25   Q.  Now, the way the Government normally tries to prove its

```
1    charges, they call witnesses, people who come into the
2    courtroom one by one, they come over to the witness stand, they
3    take the oath and they are questioned by the prosecutor.
4        Now, if we did have a trial in your case, you could sit
5    over there at defense table, you could look these people in the
6    eye, listen to whatever they have to say, and obviously you
7    could talk to Ms. Rosen-Evans about their testimony.
8        Do you understand you would be able to do that?
9    A.  Yes, Your Honor.
10   Q.  Do you also understand that after the prosecutor finished
11   asking her questions of a particular witness that
12   Ms. Rosen-Evans, as your lawyer, would stand up in front of the
13   jury, and she would question the witness so she could show the
14   jury whether there are any weaknesses or inconsistencies or
15   holes in your testimony?
16       Do you understand she could do that for you?
17   A.  Yes, I do.
18   Q.  Do you also understand that, as your lawyer,
19   Ms. Rosen-Evans has the authority to have court orders sent
20   out, subpoenas that would force other people to come to the
21   trial, or other evidence brought to the trial to help you out?
22       Do you understand she could do that, too?
23   A.  Yes, I understand.
24   Q.  At the trial itself, the Constitution guarantees you two
25   tremendously important choices, and they are the opposite of
```

 1    each other.

 2         If you wanted to, you would have the absolute right at the

 3    trial to come up on the witness stand yourself, take the oath

 4    and explain to the jury from your point of view either what

 5    happened or what didn't happen in this case.

 6         So, do you understand you could testify at the trial if

 7    that is what you wanted to do?

 8    A.  Yes, I understand.

 9    Q.  In a sense, the Constitution also guarantees you the

10    opposite, because the Constitution says you have the absolute

11    right, depending on what you choose, not to testify at trial,

12    the right to remain silent.

13         If for whatever reason you decided you were not going to

14    testify, first I tell the jury that was a right that was

15    guaranteed to you by the Constitution, and I would go a step

16    further because when the jury got ready to go out at the end of

17    the trial, I would instruct them that they could not consider

18    the fact that you had not testified.

19         So, do you understand you also have that enormously

20    important right, the right to remain silent and not testify at

21    the trial?  Do you understand that?

22    A.  Yes, I do.

23    Q.  This is probably obvious to you, but let's talk about it.

24         Do you realize that if you decide to plead guilty, what you

25    are doing is giving up all the rights, no trial, no jury, no

```
 1   witnesses, and in all likelihood, the next time you would be
 2   present in the courtroom would be at the time of sentencing?
 3       Do you understand that, too?
 4   A.  I understand.
 5   Q.  Okay.
 6       You mentioned before you got some education in connection
 7   with some other type of incarceration.  Have you been convicted
 8   of other crimes in the past?
 9   A.  Yes, I have.
10   Q.  Have you spent time in state or federal prison?
11   A.  State and federal.
12   Q.  State and federal.  What was the state charge?
13   A.  Constructive possession of guns and ammo by a convicted
14   felon and possession of marijuana.
15   Q.  That was the state charge?
16   A.  Yes.
17   Q.  What was the federal charge?
18   A.  Importing illegal drugs into the United States.
19   Q.  Where did that take place, up in New Jersey?
20   A.  New --
21   Q.  Newark?
22   A.  New York.
23   Q.  New York.  What type of sentence did you serve?
24   A.  34 months.
25   Q.  Was that a while ago?
```

1    A.   That was some ten years.

2    Q.   So, you must be familiar with some of the things I am

3    telling you; no?

4    A.   Yes, I am.

5    Q.   Do you have a copy of the Plea Agreement?

6    A.   In front of me.

7    Q.   Let's look at it.

8         Looking at paragraph one, it says you agree to plead guilty

9    to the crime of bank robbery, and it looks like there are two

10   separate counts.

11        That is correct.  Are those the crimes you agree to plead

12   guilty to?

13   A.   Yes, Your Honor.

14   Q.   I want to make sure you are aware of this.  We say every

15   single crime is made up of elements or parts and these are

16   things -- we say they are facts, we say the Government has to

17   be able to prove them, and we say they have to be able to prove

18   it beyond a reasonable doubt, so by a very high standard of

19   proof.

20        I would like to pull this crime apart and look at it.

21        I think we all sort of in our mind know what bank robbery

22   is.  First, the Government would have to prove that you

23   knowingly took from the person or the presence of a bank

24   employee money or property that was in the possession of a

25   Federally insured bank.

```
 1          Sometimes you have seen that sticker, and it says FDIC,
 2   Federal Deposit Insurance Corporation, so they have to prove
 3   that the bank was Federally insured.
 4          That is what brings it into Federal Court rather than State
 5   Court.
 6          They have to prove that you took or tried to take money
 7   from a bank employee, and they have to prove the bank was
 8   Federally insured, and then they have to prove that you did
 9   this either by --
10               THE COURT:  What is it in this case, intimidation?
11               MS. ROSEN-EVANS:  Yes.
12               MRS. ANTON:  Yes.
13   BY THE COURT:
14   Q.  Threatening harm, saying if you don't do this, you --
15   A.  I didn't threaten anyone.
16   Q.  Did you say you have to give me the money, this is a
17   robbery?
18   A.  No.
19   Q.  What did you say?
20   A.  I gave a note, five seconds, big and small bills.
21   Q.  You didn't say, I have a gun?
22   A.  No.
23   Q.  That makes it more serious.  But they have to prove that
24   you threatened them and led them to believe that you would do
25   something if you didn't give them the money.
```

Pauline A. Stipes, Official Federal Reporter

1          *THE COURT:*  I think those are the elements.  Any other

2     elements I omitted in this case?

3          *MRS. ANTON:*  No, Your Honor.

4     *BY THE COURT:*

5     *Q.*  Do you understand what the Government would have to prove

6     before you could be found guilty of the crime of bank robbery?

7     *A.*  Yes, yes, I do.

8     *Q.*  Okay.

9          Now, if you think about this, for you to make an informed

10    decision today, one of the things you absolutely need to know

11    is, if you plead guilty to the two crimes, what is the worst

12    possible punishment that could be imposed, because only by

13    knowing that can you evaluate the risk you are subjecting

14    yourself to.

15         Come over to page three, paragraph four.

16         This is a fairly serious crime because punishment could be

17    up to 20 years in federal prison, and then after any prison

18    sentence, there is something called supervised release, and

19    that is a period when somebody would be checking up on you to

20    make sure you are not violating the law, and there are usually

21    other terms and conditions.

22         So, that could be another three years, and on top of that,

23    there could be a monetary fine of $250,000, up to 250,000, and

24    I think this is the kind of crime where there also must be

25    restitution, so you have to pay it back to the bank if you got

 1   away with any money.

 2       Do you understand that is the worst possible sentence that

 3   could be imposed?

 4   *A.*   I understand, Your Honor.

 5   *Q.*   Okay.

 6       Now, when somebody comes to court and pleads guilty to more

 7   than one crime, or if there were a trial and they were found

 8   guilty of more than one crime, the sentences can be imposed in

 9   one of two ways.

10       They can be imposed so they run concurrently.  What that

11   means is, if somebody spent a day in jail on one crime, they

12   get credit for it on the other.

13       Another way is the sentence runs consecutive to the other.

14   That means in this case potentially you are facing the

15   possibility of 40 years in federal prison, three years

16   supervised release, a monetary fine up to $500,000, and, of

17   course, restitution.

18       Do you understand that is the harshest configuration of the

19   sentences?

20   *A.*   I understand, Your Honor.

21   *Q.*   I am not saying that is going to happen, but you need to

22   know these evaluations.

23       There is another law that says I have to add on a $100

24   special assessment for each of the convictions.

25       Do you understand that gets added on, too?

1    *A.*   Yes, Your Honor.

2    *Q.*   Okay.

3         Let's go back to page two for a minute and look at

4    paragraph three in that paragraph.

5         The Government is promising that they are going to make a

6    recommendation that you get a reduction in what is called the

7    sentencing guideline level because you have come to court

8    today, you are admitting what you did, you are accepting

9    responsibility, and think about it, you are also saving the

10   Government the time and expense of a trial.

11        Now, I need to make sure you understand to be eligible for

12   this particular reduction, there are things you need to be

13   willing to do.

14        The first is you be willing to sit down face-to-face with a

15   Probation Officer and just tell them everything about your

16   involvement in these two crimes.

17        Are you willing to do that?

18   *A.*   Yes, Your Honor.

19   *Q.*   The second thing, of course, is that you have not told any

20   lies or made any misrepresentations to the Government to get

21   them to go along with this; and the third thing is at least

22   from today looking forward that you are willing to make a

23   commitment that you are going to obey the law in the future,

24   and today you really have the present intention of honoring

25   that commitment.

1     Are you willing to do that, too?

2   A.  Yes, Your Honor.

3   Q.  Okay.

4     Let's take a few minutes and talk about the sentencing

5   process, it is important you understand this.  Today all across

6   the United States we use what are called the Federal Sentencing

7   Guidelines.

8     The theory behind the Guidelines is that people who have

9   committed the same crime and have the same background, they

10  need to be treated as much alike as possible.

11    The hope is that if there is greater uniformity, the whole

12  system would be more fair.

13    Here is how that works.

14    There is a committee in Washington and next to the law

15  books, and next to every crime they place a range of points.

16    I would imagine a factor is how much money was gained in

17  the robbery; the greater the amount, probably the more points.

18    I guess in somebody's mind, the picture that comes is

19  somebody that walks in with a gun, so if a gun is involved in

20  the robbery, you add more points.

21    Sometimes the type of gun can have some impact, and there

22  are other aspects like that that get factored in.

23    Another thing you look at is the background of the person,

24  and we talked about that this afternoon.  The general rule is

25  that you put a point for every prior conviction.  So you say,

21

1   has Mr. Swaby been convicted in the past?  You told me yes, and

2   so you have to say, how many times?

3        Now, I tell you, there are other things you need to look

4   at.

5        When you go back, you go into the subcategories of points

6   and you get the total number in your case, and then you need to

7   turn to the sentencing book.  There is a chart in the

8   sentencing book.

9        Did Ms. Rosen-Evans show you that chart?

10  *A.*  No.

11  *Q.*  You haven't seen the chart -- look at it.  Do we have a

12  copy of it?  Maybe you didn't recognize it.  Take a look at

13  this.

14       The theory behind this is -- does that look familiar at all

15  to you?

16  *A.*  Yes, it does.

17  *Q.*  You understand, do you -- thank you so much.

18       You understand that when you know the total number of

19  points in your case, and you look at this chart, this chart is

20  going to recommend, if you will, a recommended guideline

21  imprisonment range.

22       Do you think you understand that in a rough sense?

23  *A.*  Yes, I understand it, Your Honor.

24  *Q.*  Okay, these Sentencing Guidelines, they are important, no

25  two ways about it.

```
 1        When all is said and done, what they do is produce an

 2   advisory recommendation.

 3        It is not binding, and because of that, the sentencing

 4   judge needs to go to another statute and look at some other

 5   factors, and this is really important.  This means the actual

 6   sentence imposed could be above the guidelines, it could be

 7   inside the guidelines, and actually could be below the

 8   guidelines.

 9        I wanted to check one thing in your Plea Agreement.

10        If you came to court on the day of sentencing and you

11   listened to the sentence that was announced, if you felt that

12   that sentence wasn't a reasonable sentence, the law says you

13   would be entitled to take an appeal to ask three judges on the

14   Appellate Court to look at your case and decide whether the

15   sentence was or was not a reasonable sentence.

16        Do you understand that, too?

17   A.   I understand, Your Honor.

18   Q.   Okay, we have been talking about the sentencing.

19        I want you to take a second and think about this.

20        Certainly, it is reasonable to anticipate at the sentencing

21   Ms. Anton, who represents the Government, she is undoubtedly

22   going to come in and address the case and talk about the case

23   from the Government's point of view, and she will probably make

24   some recommendations.

25        Certainly, it is reasonable to expect that Ms. Rosen-Evans,
```

1   as your lawyer, will stand up and speak, then she, too, will

2   probably make some recommendations.

3       I need to make sure you understand that the recommendations

4   that are made by the lawyers are not binding on the Court.

5       Do you understand that?

6   A.  I understand, Your Honor.

7   Q.  Do you understand that if for some reason I don't accept

8   one or more of the recommendations, you will not be able to

9   withdraw your plea?

10      Do you understand that, too?

11  A.  I understand, Your Honor.

12  Q.  Okay.

13      Now, you told me you are a citizen of the United States,

14  right?

15  A.  Yes.

16  Q.  There is no issue of deportation in a case like this or

17  anything else.

18      I am going over to the last page in your Plea Agreement and

19  what that says is everything you are aware of negotiated on

20  your behalf, and everything you are relying on today to make

21  this important decision is down here in writing.

22      In other words, there is nobody off on the side telling you

23  something else or promising you something I have not been made

24  aware of.

25      So, Mr. Swaby, is your entire agreement with the Government

1    contained in the Plea Agreement?

2    *A.*  Yes, Your Honor.

3    *Q.*  Okay.

4        I want you to take a second and think about this.  Has

5    anybody put any pressure on you, has anybody threatened you in

6    any way, or has anybody offered you any kind of an inducement,

7    money or anything else, to get you to come to court today to

8    change your plea from not guilty to guilty?

9    *A.*  No, Your Honor.

10   *Q.*  Are you doing this freely and voluntarily?

11   *A.*  Yes, Your Honor.

12   *Q.*  Are you doing this because you really did on two separate

13   occasions go into a Federally insured bank and demand that the

14   teller turn over money to you and you did it by intimidating

15   the teller?

16   *A.*  Yes, Your Honor.

17   *Q.*  Okay.  Now, here is what I would like to do.

18       I will ask Ms. Anton if she will come up to the lectern and

19   lay out the factual basis for the pleas, what happened in each

20   situation, and I am going to ask you if you would listen, and I

21   will come back to you to see whether you think this is a

22   correct recounting of what happened.

23       If you'd like to sit down, please feel free to do that.

24   *A.*  Okay.

25            *THE COURT:*  Ms. Anton, would you put the factual basis

Pauline A. Stipes, Official Federal Reporter

1    in the record?

2          MRS. ANTON:  Yes, Your Honor.  Had this case proceeded

3    to trial, the United States would have proven the following

4    facts and others beyond a reasonable doubt:

5          On Monday, April 18, 2016, at one o'clock in the

6    afternoon, an unidentified male, later identified as Mr. Swaby,

7    entered Wells Fargo Bank on East Broward Boulevard, Fort

8    Lauderdale, Florida, which was insured by FDIC.  Swaby was

9    obstructed, approached the bank teller, handed her a piece of

10   paper that read "I want the money, big bill and small bill, you

11   have five sec," end quote.

12         The victim bank teller was in fear for her safety and

13   complied by handing him $9,980 of U.S. currency, which

14   contained an anti-theft device.  The bank teller activated the

15   silent alarm.  The robbery was on the surveillance cameras,

16   which revealed Swaby's face and clothes.

17         After that day, law enforcement officials received --

18   law enforcement was able to use this information and locate

19   Swaby near the Broward Central bus terminal on 101 Northwest

20   First Avenue, Fort Lauderdale, which is almost across the

21   street from the bank, still wearing a black baseball cap and

22   black shirt which is consistent with the robber as well as the

23   bank's surveillance of the robbery.

24         He was arrested and transported to the Fort Lauderdale

25   Police Department, provided Miranda warnings, which he waived,

 1   and recorded a statement where he admitted robbing the Wells

 2   Fargo Bank that day.  The Defendant stated he wrote the demand

 3   note with a blue marker before arriving at the bank.  Law

 4   enforcement was able to recover that from Swaby's pocket.

 5        He went into the bank and -- a surveillance photograph

 6   depicting the robbery was shown to him and he positively

 7   identified himself as the individual in the photograph robbing

 8   the bank.

 9        Swaby also admitted that he committed three other bank

10   robberies using the same modus operandi, and the Defendant

11   identified himself from pictures of each of the three banks he

12   robbed.

13        Specifically, on April 11, 2016, the Defendant, at

14   about 4:00 o'clock, entered a Chase Bank located at 790 East

15   Broward Boulevard, Fort Lauderdale and approached the bank

16   teller with a piece of paper containing writing on it.

17        The teller was unable to read the note before he told

18   her to hurry up, five seconds or I start -- Swaby made mention

19   of hurting people and the victim teller gave money to Swaby,

20   and the silent alarm was activated notifying police and they

21   were not able to apprehend Swaby that day.  The bank's loss was

22   a thousand dollars in Federally insured U.S. currency.

23        The victim teller did say he slid a note towards her

24   in addition to stating you have five seconds, and when she

25   couldn't read it, he pulled the note back.  Law enforcement did

 1   not recover that demand note.

 2           In addition, the Defendant admitted he committed a

 3   robbery at the Chase Bank on April 14, 2016, Count 2 of the

 4   indictment, at approximately 2:45 --

 5           THE COURT:  This is another Chase Bank?

 6           MRS. ANTON:  Yes, correct, one on April 11th, and one

 7   on April 14th.

 8           THE COURT:  Not at the same location?

 9           MRS. ANTON:  Not the same location.  The one on

10   April 14th was on Sunrise Boulevard, and on April 11th, East

11   Broward Boulevard.

12           On April 14th, the Defendant entered the Chase Bank at

13   2:45, that bank was located at 8285 West Sunrise Boulevard in

14   Plantation.  The Defendant approached the teller with a note

15   that said "give me the money, I want big bills and small bills,

16   you have five sic", S-I-C, end quote.

17           In fear for her life, the victim teller took

18   possession of the note and walked away.  The Defendant waited

19   briefly and he left the bank without any U.S. currency.  This

20   was captured on the surveillance system and the Defendant did

21   identify himself as the robber depicted.

22           The Defendant said he was in shock when the victim

23   took the note and was not giving him any money.

24           The last bank robbery, which the Defendant is not

25   pleading to, was committed on April 14th, at a Wells Fargo Bank

 1   on North University Drive in Sunrise, Florida.  Once inside

 2   that bank, the Defendant stood in the teller line until he was

 3   called and held up a piece of paper.  The teller was not able

 4   to read the note, but recognized a robbery.  The teller asked

 5   what he wanted and he replied, you have five secs.

 6           The victim handed him a small amount of money, and he

 7   wanted more money.  The Defendant grabbed the box and removed

 8   the money.  He walked toward the exit door and was able to exit

 9   with about $3,050 in U.S. currency which was insured by the

10   FDIC.

11           The cardboard box was impounded, but there were no

12   results as far as fingerprints or DNA obtained from that.

13           Those all happened in Broward County, and that is what

14   the Government would rely on at trial.

15           THE COURT:  The first count that Mr. Swaby is pleading

16   guilty to, is that the Wells Fargo you mentioned?

17           MRS. ANTON:  No, Count 1 is the Chase Bank robbery.

18           THE COURT:  That is the one on April 11th?

19           MRS. ANTON:  Yes, on East Broward Boulevard.

20           THE COURT:  What is the second count that he is

21   pleading guilty to?

22           MRS. ANTON:  Count 2, attempted robbery on April 14th

23   of the Chase Bank.

24           THE COURT:  So, the robbery when he was apprehended,

25   he is not pleading guilty to that.

```
 1              MRS. ANTON:  I am sorry, I am confusing you.

 2              THE COURT:  The robbery for which Mr. Swaby was

 3   apprehended is the robbery at the Wells Fargo?

 4              MRS. ANTON:  Count 4.

 5              THE COURT:  He is pleading guilty to?

 6              MRS. ANTON:  No, I charged the indictment in

 7   chronological order.

 8              THE COURT:  What are the two banks?

 9              MRS. ANTON:  Count 1 and Count 2.  Count 1 is a

10   robbery of the Chase Bank on Broward Boulevard and Count 2 is

11   the robbery of the Chase Bank and attempt on Sunrise Boulevard.

12              THE COURT:  Okay.  Is there a special provision for

13   restitution of the banks that are not charged?

14              MRS. ANTON:  There is not.  I do not have any

15   information of restitution on the victim banks.

16              THE COURT:  Wells Fargo -- they didn't lose the 9,000?

17              MRS. ANTON:  They got most of it back.

18         They generally received the whole amount back, the

19   $3,000 and $1,000 was not recovered.

20              THE COURT:  All right.  Thank you.

21         Mr. Swaby, would you be good enough to come back up to

22   the lectern.

23         I know we covered a lot of ground there, I want to

24   come back for a second.

25         If I understand Ms. Anton, and I ask Ms. Rosen-Evans
```

```
 1   to double check me, I take it the two counts you are pleading

 2   guilty to is, number one, the actual robbery of a Chase Bank on

 3   Broward Boulevard, and the other one is an attempted robbery of

 4   a Chase Bank on West Sunrise.

 5          Is that right?

 6          MS. ROSEN-EVANS:  I don't have the indictment in front

 7   of me, Your Honor.

 8          THE COURT:  Let's take a second so we are clear on

 9   this.

10          MS. ROSEN-EVANS:  Count 1, Mr. Swaby would be pleading

11   to on April 11th, he did knowingly take by intimidation from

12   the employees of a Chase Bank located at 790 East Broward

13   Boulevard approximately $1,000.

14          THE COURT:  That is Count 1.

15          MS. ROSEN-EVANS:  Count 2 would be the attempt that

16   occurred on April 14, 2016, that he did knowingly attempt to

17   take from the presence of employees of the Chase Bank at 8285

18   West Sunrise in Plantation.

19   BY THE COURT:

20   Q.  Okay, first I want to say to you, do you admit that you did

21   everything that Ms. Anton suggested with respect to those two

22   banks, the two Chase Banks?

23   A.  Everything but using the word "robbery" and threatening

24   people.  I didn't threaten anyone.

25   Q.  Do you think you took the money by intimidating the people?
```

Pauline A. Stipes, Official Federal Reporter

 1  *A.*  I wouldn't say intimidation, no.  I just handed her the

 2  note.

 3          *MS. ROSEN-EVANS:*  Your Honor, it is an objective

 4  standard.

 5          *THE DEFENDANT:*  It is a form of intimidation.

 6  *BY THE COURT:*

 7  *Q.*  You did the things she said you did and a teller would be

 8  intimidated.

 9      Mr. Swaby, if you walked into the bank and said hi, I am

10  Mr. Swaby, could I have $5,000, you acknowledge they are not

11  going to give you the money, do you not?

12  *A.*  Yes.

13  *Q.*  The question is, did you rob those two banks in the manner

14  in which Ms. Anton suggested?

15  *A.*  No, I didn't threaten anyone or say I was going to hurt

16  anyone or use the word "robbery".

17          *THE COURT:*  Okay.  Well, I don't think I am going to

18  take your plea.  I am going to set this matter for trial.  We

19  should have done this at the beginning.  It has to be by force

20  and intimidation.

21          If you say you didn't, you were being friendly with

22  them and said I would like the money, would you give it to me,

23  that is not a robbery.

24          *MS. ROSEN-EVANS:*  May I have a moment?  It is an

25  objective standard.

```
 1          THE COURT:  Talk to Mr. Swaby, take a minute.
 2          (Pause).
 3          THE COURT:  Mr. Swaby, come back to the lectern.  Let
 4    me read this to you, it might help you a bit.
 5          Please understand, in Federal Court the judge cannot
 6    have any involvement in plea negotiations, so I don't want to
 7    do that.  I just want to make sure you understand what the law
 8    is, and you do whatever you want.  It is absolutely up to you.
 9          There is a case called United States versus Kelly, a
10    decision back in 2005, by what is called the Eleventh Circuit.
11    That is the Appellate Court that covers this part of the
12    country, Florida and Georgia and so on.
13          And so, in looking at this statute, the robbery
14    statute, remember I said before a robbery can be committed by
15    different means, and the one that jumps in everybody's mind is
16    the fellow who jumps in with the gun and says hand me the
17    money.
18          We all admit if a teller is afraid, that is the
19    classic, if you will, example of an armed robbery.  But you can
20    also have a robbery when it is done by intimidation, that is
21    the word.
22          Now, listen to what they say about that.
23          The Court says intimidation occurs when an ordinary
24    person in the teller's position reasonably could infer a threat
25    of bodily harm from the Defendant's acts.  Whether a particular
```

Pauline A. Stipes, Official Federal Reporter

1    act constitutes intimidation is viewed objectively.

2              In other words, we don't look into the mind of the

3    teller or look into your mind, but we look at what actually

4    occurred, and a defendant can be convicted under this section

5    even if he did not intend for an act to be intimidating.

6              So, that is what the law says about this.

7              And the question is whether a reasonable person would

8    conclude that the handing of a note saying give me your money,

9    or whatever the note said, you have five seconds, five sec,

10   whether that is an intimidating action that a reasonable teller

11   would conclude if I don't do what he says he is going to harm

12   me somehow.

13   BY THE COURT:

14   Q.  So, the question I have to put to you is, do you admit that

15   you did the things Ms. Anton said and that you did in fact get

16   the money by intimidating the tellers, intimidating the one

17   teller at Chase in Broward, and attempting to intimidate the

18   other teller?

19   A.  Yes, yes, Your Honor.

20   Q.  All right.  Now, let me tell you why I have limited my

21   questions to you to those two banks, because in figuring out

22   the sentence, obviously, you look at those two banks but -- and

23   this is really important to you -- there is a concept called

24   relevant conduct, and what that means is, the judge can look at

25   other acts other than what you have pled guilty to, and if they

1    are similar and part of the same pattern of activity, they can

2    be considered in deciding what your sentence could be.

3        Now, remember, there is no way your sentence can be longer

4    than 40 years in federal prison, okay.

5        But in trying to decide what the sentence could be, do you

6    understand that the Court can look at the other robberies?

7    A.   Yes, Your Honor.

8    Q.   Okay.

9        And it is interesting because issues like that, you know,

10   whether there was another robbery, whether it is relevant

11   conduct, and so on, that is decided by what we call the civil

12   standard, by the greater weight of the evidence.

13       The normal trial is proof beyond a reasonable doubt.

14       I want to make sure that nobody is -- you aren't being

15   misled here because they are talking about one robbery and an

16   attempted robbery, but you need to understand at the time of

17   sentencing, the Government is going to say, wait a second,

18   Judge, you have to look at all of this, you have to look at

19   Wells Fargo, two Wells Fargo banks you have to consider in

20   addition to the Chase Banks.

21       Do you understand that?

22   A.   Yes, Your Honor.

23   Q.   Okay.

24       Now, we tend to divide crimes into two categories.  If a

25   crime is a less serious crime where the punishment cannot be

 1    greater than one year in jail, we call that a misdemeanor.

 2         But if you have a crime where the punishment could be

 3    longer than one year in jail, that is a felony.

 4         I want to tell you both of these crimes, both the bank

 5    robbery crime and the attempted bank robbery crime, they are

 6    listed as felonies.

 7         Now, I want to take a second because we really didn't talk

 8    about attempt when I was going through the elements of the

 9    crime.

10         On the Chase Bank on Broward, they are saying that is a

11    completed bank robbery, you went in, gave the note, you

12    intimidated the person and they handed you -- and I think they

13    said it was about a thousand dollars.

14         The one out on Sunrise, the other Chase Bank, they are

15    saying you went in and handed the note, and for whatever

16    reason, the teller walked away so there really was no completed

17    robbery.

18         We say that someone can be found guilty of what is called

19    an attempt to commit a robbery if they take what is called a

20    substantial step to achieving the goal of robbing the bank.

21         Now, it has to be more than what is called mere

22    preparation, so if somebody had a get-away car and they parked

23    the get-away car out back, somebody might say they are just

24    preparing, but the Government is claiming here you went into

25    the bank and handed the note, so you took a substantial step

 1    toward committing that other robbery, and they are claiming you

 2    are guilty of attempted bank robbery.

 3        Do you understand that?

 4    A.  I understand.

 5            THE COURT:  I want to double check with the lawyers.

 6            The attempt crime carries the same punishment?

 7            MS. ROSEN-EVANS:  Yes.

 8            THE COURT:  All right.  Okay.

 9    BY THE COURT:

10    Q.  So, I was saying to you both of these crimes are

11    categorized as felonies.

12        If I conclude you really know what you are doing, you are

13    making an informed and voluntary decision, what I would do is I

14    would accept your plea and I kind of put the Court's seal of

15    approval on it.  That is called technically adjudicating you to

16    be guilty of these crimes, adjudicating you to be guilty.

17        The minute that happens, you are characterized as a

18    convicted felon.  You may already be considered a convicted

19    felon, but this adds it on top.

20        When somebody is characterized as a convicted felon, they

21    automatically lose civil rights; you lose the right to vote,

22    you are not able to possess a firearm, and you would not be

23    able to sit on a jury or run for public office.

24        Do you understand you will automatically lose those

25    valuable civil rights?

1    *A.*  Yes, Your Honor.

2    *Q.*  Okay.

3       Now, I have had the chance to talk with you and observe

4    you, and I want you to know, I think you are a very intelligent

5    person and I am satisfied you are competent to make the

6    decision you are thinking about making.

7       We talked about all of the Constitutional rights to trial

8    by jury and all those rights.  We have gone through all of the

9    provisions in your Plea Agreement and we talked about the

10   sentencing process, and I am satisfied you understand all of

11   these aspects, but I want to ask you, is there anything I have

12   not touched on, any questions or concerns you have that you

13   wanted to raise?

14   *A.*  No, Your Honor.

15   *Q.*  Is it still your desire to go forward and enter the two

16   pleas we have been discussing?

17   *A.*  Yes, Your Honor.

18       *THE COURT:*  Okay, let me turn to Ms. Rosen-Evans and

19   ask if she would formally enter the pleas for you.

20       *MS. ROSEN-EVANS:*  Mr. Swaby will withdraw the pleas of

21   not guilty and enter pleas of guilty to Counts 1 and 2 of the

22   indictment.

23       *THE COURT:*  Mr. Swaby, is that what you want to do?

24       *THE DEFENDANT:*  Yes.

25       *THE COURT:*  Thank you.

Pauline A. Stipes, Official Federal Reporter

```
 1            In case number 16-CR-60117, United States versus

 2    Anthony Swaby, it is the finding of the Court that Mr. Swaby is

 3    fully competent and capable of entering informed pleas, I find

 4    both of his pleas are knowing and voluntary pleas, each one of

 5    which is supported by an independent basis in fact containing

 6    all the essential elements of these two offenses.

 7            Therefore, I now accept Mr. Swaby's pleas of guilty

 8    and I now adjudge him to be guilty of the crimes set forth in

 9    Counts 1 and 2 of the indictment, which are the charges of bank

10    robbery and attempted bank robbery, in violation of Title 18

11    United States Code, Section 2113(a).

12            So, I now adjudicate Mr. Swaby to be guilty of those

13    two crimes.

14            Mr. Swaby, what I am going to do now is ask a

15    Probation Officer to get started right away on a Pre-Sentence

16    Investigation Report for you.

17            I want to make sure you get it well before the

18    sentencing, and I will ask you to sit down with Ms. Rosen-Evans

19    and go over it word for word.

20            If there is a problem, we can straighten that out at

21    the time of sentencing.

22            Anything else to come before the Court today?

23            MRS. ANTON:  No, Your Honor.

24            MS. ROSEN-EVANS:  No, Your Honor.

25            THE COURT:  I will excuse the parties, and Mr. Swaby,
```

1   I look forward to seeing you at that time.  I will enter a

2   separate order scheduling the sentencing.

3       *(Thereupon, the hearing was concluded.)*

4                           * * *

5               (End of requested transcript)

6                           -oOo-

7       I certify that the foregoing is a correct transcript

8   from the record of proceedings in the above matter.

9

10      Date:  January 6, 2017

11              /s/ Pauline A. Stipes, Official Federal Reporter

12                  Signature of Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

Pauline A. Stipes, Official Federal Reporter